UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**JUN 1 8 2008**

**Clerk, U.S. District and
Bankruptcy Courts**

DIOSDADO GRUSPE
LIBERTAD
SAN NARCISO
2205 ZAMBALES
PHILIPPINES 601

VS.

THE HONORABLE DONALD C. WINTER
SECRETARY OF THE NAVY
DON # 076158102565
DEPARTMENT OF THE NAVY
HUMAN RESOURCES OFFICE
PSC 473, BOX 22, N134
FPO AP 96349-0022

CIVIL ACTION NO.

Case: 1:08-cv-01040
Assigned To : Robertson, James
Assign. Date : 6/18/2008
Description: Employ. Discrim.

## COMPLAINT

I filed a discrimination complaint through the U.S. Department

of the Navy, Human Resources Office, (Yokosuka, Japan), PSC 473

Box 22, N134, FPO AP 96349-0022, about the Department's non-

compliance in the implementation of Office of Personnel

Management's (OPM), Public Law No. 100-238, section 110, that

provided to any individual meeting the definition of an "employee"

as defined at 5 United States Code (USC), section 8331(1) to avail

of having to make a deposit to the Civil Service Retirement and

Disability Fund (Fund) for those employee of the Federal

Government where no retirement deductions were withheld from

their salary. The Department of the Navy, under the law, as an

agent of OPM in this matter, failed to inform me (us) about the

law's implementing regulations and rules during its open season

**RECEIVED**

**JUN 1 0 2008**

Clerk, U.S. District and
Bankruptcy Courts

1

from January 8, 1988 until January 8, 1990, and when the Navy
left the Philippines in November 1993, and later came to know about
the law in 2007, and did filed a claim for discrimination. The
Department's rejected my claim on the ground that I have no right
to come within Title VII of the Civil Rights Act of 1964, as
amended, pursuant to 29 Code of Federal Regulation (CFR) 1614.103
(c) 4 which provided that "Aliens employed in positions, or who
apply for positions, located outside the limits of the United
States" are not covered under Title VII.

The dismissal of the complaint read in pertinent part as follows:

> The dismissal of this complaint is not based on the
> merits of the complaint's claim that he should have been
> covered under the civil service retirement system. The
> dismissal of the instant case is based solely on the
> employee's status as a non-U.S. citizen and therefore he
> has no standing to file a claim of discrimination under
> the provisions of reference (c).

Citizenship in the United States-Every sovereign state determine
for itself the circumstances which shall be recognize as
creating natural or native-born citizenship, as well as the
conditions under which an alien may be admitted to membership in
its citizen body. Many states adopted their general principle
the jus sanguinis, accordingly to which the children take
citizenship of the father, or, if illegitimate of the mother.
Other states accept the rule of jus soli, according to which a
person becomeas a citizen of the state  within whose territorial
limits he is born. This latter rule is constitutionally
obligatory upon the United States ("US").

2

As a result of the Spanish-American War, the US acquired certain
territory the inhabitants of which were held to be neither aliens
or citizens of the United States.

Sapin ceded the Philippine Islands, Guam, and Porto Rico to the
US under the terms of the "Treaty of Peace" signed in Paris
December 10, 1898.

In England, a citizen was a person who was born in that country
and remained under its jurisdiction. In the rest of Europe
citizenhsip was determined by parental nationality. The English
version was the prevailing assumption in America. These two doc-
trines existed at the time the US Constitution was written.

The Fourteenth Amendment to the US Constitution, ratified in 1868
the first sentence of the amendment state that "(a)ll persons
born or naturalized in the United States" and subject to its
jurisdiction are citizens of the US and of the state where they
reside. (See Civil War Amendments).

Following the transfer from Spain of the Philippine Islands to
the US in Article III of the Treaty of Paris of December 10, 1898,
see 30 Stat. 1254, which ended the Spanish American War. President
McKinley established a civil authority over the Philippines known
as the Philippine Island Commission. The powers and duties of the
Commission were set forth in Presidnetial Instructions to the
Commission dated April 7, 1900, and reaffirmed by Executive Order
(unnumbered) dated June 21, 1901. By the Act of July 1, 1902,
32 Stat. 691, Congress expressly ratified both the Presidential

3

Instructions and the Executive Order. See Ivanhoe Irrigation

District v. McCracken, 357 U.S. 275, 293-94 (1958)/

The Presidential Instructions vested the Commission, effective

September 1, 1900, with "that part of the power of government

in the Philippine  Islands which is of a legislative nature"

until Congress provided otherwise or a different central

government was established.

The Act of July 1, 1902, in addition to ratifying the President's

orders establishing the Philippine Commission, clearly indicated

that, while the Philippines were subject to the sovereignty of

the US, they were not to be deemed a part of the US for purposes

of the applicability of Federal statutes generally. Section of

the Act of Congress of July 1, 1902 in Public No. 235, it provides:

> An Act temporarily to provide for the administration
> of Civil Government in the Philippine Islands, and for
> other purposes.

Section 1 of the 1902 Act stated as follows:

> The provisions of section 1891 of the Revised Statutes of
> 1878 shall not apply to the Philippine Islands.

Section 1891, referred to above, provided that:

> The Constitution and all laws of the United States which
> are not locally inapplicable shall have the same effect
> within all organized Territories, and in every Territory
> herafter organized as elsewhere within the United States.

In addition, Congress specifically provided for citizenship for

inhabitants of the Philippines that was separate from United

States citizenship. Section 4 of the Treaty of Paris contained a

listing of Philippine citizenship. It read:

4

4. That all inhabitants of the Philippine Islands
continuing to reside therein who were Spanish subjects
on the eleventh day of April, eighteen hundred and
ninety-nine, and then reside in said Islands, and their
children born subsequent thereto, shall be deemed and
held to be citizens of the Philippine Islands and as
such entitled to the protection of the United States
except such as shall have elected to preserve their
allegiance to the Crown of Spain in accordance with
the treaty of peace between the United States and Spain
signed at Paris December tenth, eighteen hundred and
ninety-eight.

The object of these temporary provisions were to maintain the

responsibility of the US for the general conduct of the Civil

Government prior to the inauguration of the Philippine

Commonwealth Government, at the end of which the islands were

to become a "state."

Congress passed the so-called "Tydings-McDuffie act," approved

by the President on March 24, 1934, called the "Independence

Act of 1934." This Act have brought a <u>change</u> in the status of

the islands, and thus <u>created</u> the "Commonwealth of the

Philippines" attaining its new standing as "COMMONWEALTH OF THE

PHILIPPINE ISLANDS," as now a "'state'" though not an independent

state. <u>See</u> attached copy of a National Archives reference report

relating to US Treaties and International Agreements, part of

which, analyzing the status of the newly created "COMMNONWEALTH

OF THE PHILIPPINE ISLANDS," as part of the Union of American

states.

Both the Acts of Congress and the ordinance appended the

Constitution of the Commonwealth of the Philippine Islands show

clearly that it was intended that full sovereignty over the

Philippines was to be retained by the US during the transition

5

period of ten years (November 15, 1935 to July 3, 1946), provided for in the Act. They show that, while the government of the Philippine Islands was to have a large measure of self-government, they were not to constitue a separate state under the rules of international law. In other words, it was clearly intended that the United States and the Philippine Islands should constitute a singel state.

Therefore, under the default rule in the Treaty of Peace, those born on and after November 15, 1935 but before July 4, 1946, were citizens of the United States under the doctrine of "jus soli," they being borned in the continental US where they reside, and were also citizens of the Philippine Islands (dual citizenship) as called for under the US CONSTITUTION in its Fourteenth Amendment.

I was born in then state of the Commonwealth of the Philippine Islands, on December 14, 1939, with dual citizenship. Thus, I met the conditions of citizenship under the FOURTEENTH AMENDMENT definition of a (US) citizen.

In Afroyim v. Rush (1967) the Supreme Court of the United States, hled, 5-4, that Congress has no power "to take away an American citizenship without his assent."

Since then I never went into open court (US Court) to renounce any of my dual citizenship.

6

I am requesting that this Honorable Court to confirmed my having been a U.S. citizen under the doctrine of "jus soli" when born in then "Commonwealth of the Philippine Islands" which had attained its new status as a new "state" and therefore, clothed with the provisions of the U.S. Constitution, and thus, the Fourteenth Amendments of the US. Constitution thus, applied, in my status.

I ask for a trial by jury in this case, and am not specifying an amount of money, but, rather ask the Honorable Court to confirmed by having been born a U.S. citizen, so the Department of the Navy allow me to come within the meaning of the Civil Rights Act of 1964 in Title VII.

The phrased "Aliens employed in positions, or who apply for positions, located outside the limits of the United States" apply to a non-citizen of the country in which the duty station is located, not referenced to a local national employed in that foreign country.  See Document by the Department of the Navy, dated May 2, 1949, categorizing its former employees under, as either "alien" or local national (native born), attached.

Respectfully submitted,

Diosdado Gruspe
Libertad, San Narciso, 2205 Zambales
Republic of the Philippines 601

Enclosures:
Printed copy of the treaty of Paris, from Treaties and Other International Agreements of the United States, 1776-1949, edited by Charles I. Behans, and copy of National Archives reference report pertaining to the US Treaties and International Agreements.

494                    CHAPTER IV —TERRITORY AND SOVEREIGNTY OF STATES

the British Empire, France, and Japan relating to their insular possessions and insular dominions in the region of the Pacific Ocean, 43 Stat. 1646; 4 Treaties, etc. (Trenwith, 1928) 4883). Replying on April 3, 1924 the Department of State said:

> The controversies referred to in [the treaty] . . . do not, as indicated in the declaration accompanying the Treaty, embrace questions which, under the principles of international law, lie exclusively within the domestic jurisdiction of the respective powers. The question whether independence shall be granted to the Philippine Islands is one which lies exclusively within the domestic jurisdiction of the United States. I, therefore, do not consider that the Treaty mentioned, the declaration accompanying the Treaty, or the Treaty supplementary thereto, concluded February 6, 1922, in any manner affect the exclusive right of this Government to withhold or to grant independence to the Islands in question.

> Representative Fairfield to Secretary Hughes, Mar. 25, 1924, and Mr. Hughes to Mr Fairfield, Apr. 3, 1924, MS. Department of State, file 811b.01/63.

**No treaty obligation**

In a communication of October 3, 1930, addressed to the Department of State, it was asked whether there was any obligation under any treaty entered into at any time on the part of the United States, either with Spain or directly with the Philippine people, wherein the United States was in any manner bound to a promise of independence of the Islands. Replying on October 10, 1930 the Department said that—

> there is no treaty provision by which the United States promises the independence of the Philippine Islands. Such independence lies wholly in the discretion of the United States to be exercised through the appropriate Constitutional method. The United States has made no agreement on the subject nor has there been any authoritative or official promise on the subject by either the executive or Congress. The Sixty-fourth Congress in a preamble to the present Organic Act (Statutes at Large, Vol. 39, Par. 1, p. 545) on this subject and various Presidents have made statements as to the ultimate purpose of the United States in certain circumstances or conditions. No such statements, of course, constitute an official commitment of the Government.

> Representative McCormick to the Department of State, Oct. 3, 1930, and Assistant Secretary Castle to Mrs. McCormick, Oct. 10, 1930, MS. Department of State, file 811b.01/139.

**Act of 1933**

On January 17, 1933 the so-called "Hare-Hawes-Cutting act", to enable the people of the Philippine Islands to adopt a constitution and form a government, to provide for the independence of the islands, and for other purposes, was passed by Congress over a presidential veto (47 Stat. 761-770). The act provided that it should not

08 1040
**FILED**
JUN 1 8 2008
Clerk, U.S. District and
Bankruptcy Courts

take effect until it should be accepted by the Philippine Legislature or by a convention called for that purpose. The first section of the act was not accepted.

H. Rept 968, 72d Cong., 2d sess., pp. 2, 3.

Congress passed another act, the so-called "Tydings-McDuffie act", approved by the President on March 24, 1934, providing for the complete independence of the Philippine Islands upon the expiration of a period of ten years from a specified date and upon compliance with certain conditions. This act, like that of 1933, was not to take effect until accepted by the Philippine Legislature or by a convention called for that purpose by the Legislature. It authorizes the Philippine Legislature to provide for the election of delegates to a constitutional convention to formulate and draft a Constitution "for the government of the Commonwealth of the Philippine Islands". Section 2 provides that the Constitution shall be republican in form, shall contain a bill of rights, and shall provide that, "pending the final and complete withdrawal of the sovereignty of the United States" over the Islands, all citizens and officers of the Philippine Islands shall owe allegiance to the United States. Pending the attainment by the Islands of complete independence, all acts of the Legislature of the Commonwealth are to be reported to the Congress of the United States and certain acts, namely, those relating to currency, coinage, imports, and immigration, are not to become effective until approved by the President of the United States. Section 2 further provides that meanwhile the foreign affairs of the Islands "shall be under the direct supervision and control of the United States"; that the decisions of the courts of the Commonwealth shall be subject to review by the Supreme Court of the United States (as now provided by law); and that the United States shall have the right to intervene for the preservation of the government of the Commonwealth, for the protection of life, property, and individual liberty, and for the discharge of government obligations under and in accordance with the provisions of this Constitution.

The act provides (sec. 3) that the Constitution to be drafted and approved by the constitutional convention should be submitted to the President of the United States and, if certified by him to conform to the act, to the people of the Philippine Islands for their ratification (sec. 4); that such ratification should be deemed an expression of the will of the people of the Philippine Islands in favor of independence; and that when obtained, and proclaimed by the President of the United States, "the existing Philippine Government shall terminate and the new government shall enter upon its rights", etc.

*Independence Act of 1934*

*Constitution of the Commonwealth*



496       CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

**High Commissioner**

The act authorizes the President to appoint, by and with the advice and consent of the Senate, a United States High Commissioner to the government of the Commonwealth of the Philippine Islands, to be the representative of the President in the Islands, to have access to the records of the government of the Commonwealth, and to be furnished by the Chief Executive of the Commonwealth with such information as he shall request. The government of the Commonwealth is authorized to be represented in the United States by a Resident Commissioner with a non-voting seat in the House of Representatives. (Sec. 7.)

**Independence in ten years**

Section 10 of the act stipulates that on the fourth day of July immediately following the expiration of a period of ten years from the date of the inauguration of the government of the Commonwealth, the President of the United States "shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands . . . and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force".

**Neutralization**

Section 11 requests the President of the United States, at the earliest practicable date, to enter into negotiations with foreign powers with a view to the conclusion of a treaty for the perpetual neutralization of the Philippine Islands, if and when Philippine independence shall have been achieved. Section 12 provides that upon the proclamation and recognition of the independence of the Philippine Islands, the President shall notify foreign governments thereof and invite their recognition of such independence.

Section 15 repeals certain laws and parts of laws and provides for the continuance in force of others until they shall be altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States.

A concurrent resolution accepting the act was adopted by the Senate and House of Representatives of the Philippine Legislature in joint session on May 1, 1934.

**Constitution approved**

A Constitution of the Philippines was adopted by a Philippine constitutional convention on February 8, 1935. On March 23, 1935, the President of the United States notified the Governor General of the Philippine Islands that the proposed Constitution had been submitted to him and that he certified that "the same conforms substantially with the provisions of the Act of Congress approved March 24, 1934".

TERRITORIAL POSSESSIONS OF THE UNITED STATES

**497**

48 Stat. 456 462, MS. Department of State, file 811b.01/215½ (f. Dec. Act, 73d Cong., 2d sess., S. Doc 43, 74th Cong., 1st sess.

On November 6, 1935 the Minister of the Union of South Africa presented to the Secretary of State an inquiry from the South African Department of Customs and Excise relative to the classification of the Philippine Islands for customs and statistical purposes. The Secretary of State replied that until the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty in the Philippines as provided in section 10 (a) of the Independence Act, "sovereignty over the Philippine Islands rests with the United States."

Secretary Hull to the Minister of the Union of South Africa, Nov. 15, 1935, MS. Department of State, file 811b.01/261. See, to the same effect, the Legal Adviser of the Department of State to Comptroller Peabody of the Department of Administration and Finance of Minnesota, Nov. 25, 1936, ibid. 811b.01/364.

In the case of *Cincinnati Soap Co.* v. *United States*, decided by the Supreme Court of the United States on May 3, 1937, involving the constitutionality of an appropriation to the Philippine treasury of certain processing taxes provided for in section 602½ of the Revenue Act of 1934 (48 Stat. 680, 763), the Court said:

The Philippine Islands and their inhabitants, from the beginning of our occupation, have borne a peculiar relation to the United States. The Islands constitute a dependency over which the United States for more than a generation, has had and exercised supreme power of legislation and administration, *Posadas* v. *National City Bank*, 296, U.S. 497, 502, a power limited only by the terms of the treaty of cession and those principles of the Constitution which by their nature are inherently inviolable.

With reference to the effect of the Philippine Independence Act of 1934, the Court said:

But it is contended that the passage of the Philippine Independence Act of March 24, 1934, c. 84, 48 Stat. 456, and the adoption and approval of a constitution for the Commonwealth of the Philippine Islands have created a different situation; and that since then, whatever may have been the case before, the United States has been under no duty to make any financial contribution to the islands. Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been, and for a long time may not be, finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory. By express provision of the Independence Act, we still retain powers with respect to our trade relations with the islands, with certain exceptions set forth particularly in the act. We retain powers



498                    CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

with respect to their financial operations and their currency; and we continue to control their foreign relations. The power of review by this court over Philippine cases, as now provided by law, is not only continued, but is extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands.

Thus, while the power of the United States has been modified, it has not been abolished. Moral responsibilities well may accompany the process of separation from this country; and, indeed, they may have been intensified by the new and perplexing problems which the Philippine people now will be called upon to meet as one of its results. The existence and character of the consequent obligations and the extent of the relief, if any, which should be afforded by the United States in respect of them, are matters, not for judicial but for Congressional consideration and determination.

302 U.S. (1937) 305, 313–314, 319–320.

<span style="float:left">Diplomatic<br>formalities</span>

As to the honors which should be accorded the President of the Philippine Commonwealth during a visit to a foreign state, the Department of State on January 29, 1937 said that—

the **Philippine Commonwealth is not an independent state** and its President is not entitled to the honors usually accorded to a chief of state. Sovereignty of the Philippine Islands remains with the United States and the only official of the United States entitled to such honors is the President of the United States. When the Commonwealth Government was inaugurated, it was decided that the High Commissioner to the Philippine Islands, representing the President of the United States, should have precedence over the President of the Commonwealth and that both of those officials should be entitled in the Philippines to salutes of 19 guns.

Until such time as the Philippine Commonwealth becomes entirely free and independent of the United States, it is expected that when honors are rendered any official of the Philippine Commonwealth, the flag of the United States be displayed.

Secretary Hull to Ambassador Johnson, Jan. 29, 1937 (telegram), MS. Department of State, file 811b.001 Quezon, Manuel L/55.

In circular instructions to certain diplomatic and consular officers on Apr. 28, 1937 Assistant Secretary Carr said:

A ruling was made at the time of the inauguration of the Commonwealth Government establishing the rank of the President of the Philippine Commonwealth as analogous to that of a Governor of a State and providing that the President of the Commonwealth would rank with, but after, the United States High Commissioner to the Philippines.

This same ruling also prescribed that both the United States High Commissioner and the President of the Philippine Commonwealth would be entitled to a salute of nineteen guns in Philippine territory or Philippine waters on which occasions only the flag of the United States should be flown. In consequence, the President of the Philippine Commonwealth has

EXTRADITION TRANSMISSION OF FUGITIVE CRIMINALS

not recognized international character and could not be accredited in its own usually governed chief of state. Nor could he be accredited to any states or the representatives of foreign states to the Philippine nation.

"If, in case, too, with the usages . . . introduction, outside of the Philippine Government . . . Philippines . . . near foreign State, the Government of the Philippines . . . directed . . . carrying on, the United States should nevertheless insist that control in relation to the right of Governments 1934, or the Philippine nation . . .

"The head of diplomatic missions . . . representatives of the President of the United States . . . the jurisdiction . . . the country . . . to which they are accredited . . . are the President of the United States government.

"It is desired that, when an occasion arises which, in your opinion requires such action, the incidents . . . any instruction be brought to the attention of the appropriate authorities."

MS. Department of State, file 811.05/4411a

In a letter to the Secretary of State on April 30, 1936, with reference to the subject of extradition between the Philippine Islands and foreign countries, the Acting Attorney General said:    **Extradition**

This has done, inter alia, interpretation of the provision in the Philippine Independence Act that "foreign affairs" shall be under the direct supervision and control of the United States." [Sec. 2(a) (10), Act of March 24, 1934, 48 Stat. 457.]   As a matter of first impression this provision appears to be somewhat indefinite and suggests the question whether the Congress contemplated that the Government of the Commonwealth of the Philippine Islands should deal with foreign nations subject to supervision and control or in just what manner, and by whom, foreign affairs affecting the Philippine Islands should be handled.

The Acting Attorney General having requested the views of the Department of State, the Secretary of State, with a letter dated May 26, 1936, submitted a memorandum reading in part as follows:

The provision of the 10th subdivision of Section 2(a) of the Act of March 24, 1934, is one of a number of provisions which the bill required should be contained in the Constitution of the Philippines and which should be in effect "pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands". The object of these temporary provisions was to maintain the responsibility of the United States for the general conduct of the government of the Philippines during the ten-year transition period, at the end of which the islands were to become completely independent.

. . . It will be observed that the principal part of the Constitution [of the Philippine Islands adopted by the constitutional convention in pursuance of the act of Congress of March 24, 1934], which contains sixteen articles, is drawn in such form that it will become completely effective, without change, when the islands become independent. However, there is appended to the Constitution an ordinance setting forth the special relationship



500                    CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

between the Philippine Islands and the United States during the
transition period, while the United States remains sovereign in
the islands. These provisions accord with the provisions con-
tained in Section 2(a) of the Act of March 24, 1934. Thus the
language of the 10th subsection of Section 1 of the ordinance is
the same in phraseology as that of Section 2(a) (10) of the Act
of March 24, 1934.

Both the Acts of Congress and the ordinance appended to the
Constitution of the Philippines show clearly that it was intended
that full sovereignty over the Philippines was to be retained by
the United States during the transition period of ten years pro-
vided for in the Act. They show that, while the government of
the Philippine Islands was to have a large measure of self-
government, they were not to constitute a separate sovereign
state under the rules of international law. In other words, it
was clearly intended that the United States and the Philippine
Islands should continue to constitute a single state. This is made
clear, not only by the provision that the foreign affairs of the
Philippines "shall be under the direct supervision and control
of the United States", but also by the various other provisions
contained in the Act, and repeated in the ordinance appended to
the Constitution setting forth in detail the continued authority
and responsibility of the United States in the Philippines during
the transition period. Among them is the provision, to which
special attention has already been called, under which the Presi-
dent of the United States may intervene for the preservation of
the government of the Commonwealth of the Philippines, for the
protection of life, property and liberty and "for the discharge
of government obligations under and in accordance with the pro-
visions of the constitution".

. . . it is believed that it is the intent of the statutory provi-
sion in question that foreign affairs pertaining to the Philippine
Islands are to be conducted and not merely supervised by the
United States. The use of the adjective "direct" to modify the word
"supervision", and the addition of the word "control", both seem
to emphasize this point. Needless to say, the Government of the
United States, acting through the High Commissioner to the
Commonwealth of the Philippine Islands, may call upon the
government of the latter for cooperation and assistance in mat-
ters pertaining to foreign affairs, including the extradition of
criminals, as well as the protection of aliens in the islands, but
it is believed that communications between the government of
the islands and foreign governments must be carried on through
the High Commissioner.

It may be well to make mention of the following provision of
Section 12(9) of Article VIII of the Constitution of the
Philippines:

"The President shall have power, with the concurrence of a
majority of all the Members of the National Assembly, to make
treaties, and with the consent of the Commission on appoint-
ments, he shall appoint ambassadors, other public ministers and

**Philippines not a sovereign state**

consuls, and he shall receive ambassadors and other ministers duly accredited to the Government of the Philippines."

It cannot be maintained that the provision just quoted overcomes or in any way limits the provision of the statute and ordinance that during the transition period "foreign affairs shall be under the direct supervision and control of the United States." On the contrary, it is quite clear that the provision of Section 12(1) of Article VII of the Constitution is subject to and limited by the provision of Section 1(10) of the ordinance, just as other provisions in the principal parts of the Constitution are, during the said period, subject to and limited by provisions in the ordinance. The whole object of the ordinance is to maintain the authority and responsibility of the United States in the islands during the period in question, and it necessarily follows that they place limitations upon the authority of the government of the Philippines during the same period. . . . It seems clear that, in view of the statutory provision under discussion, the President of the Philippines could not perform these functions unless expressly authorized by the Government of the United States. It has been suggested that Philippine citizens might be sent as commercial agents to foreign countries, but, for the reasons mentioned, the sending of such persons would also be subject to the authorization of the United States. The provision of the Act of March 24, 1934, under consideration evidently covers all matters concerning foreign affairs which pertain to the Philippines.

Unfortunately, the report of the Committee on Territories and Insular Affairs of the Senate of March 15, 1934, concerning this bill, S. 3055, which became the Act of March 24, 1934, contains no special discussion of the particular provision of the Statute in question. It may be observed, however, that the report calls attention to the fact that the bill was a "proposal to reenact the Hare-Hawes-Cutting bill" with certain exceptions having no application to the provision now under consideration. In this connection it may further be observed that in the report of the Committee, of February 24, 1932, concerning the Hare-Hawes-Cutting bill, there appears the following passage:

"It is also provided that foreign relations of the Islands shall be *exclusively* under the control and supervision of the United States, and that our Government at any time may intervene to prevent a violation of international obligations." [Italics added.]

The statutory provision in question, as construed in the Committee's report just quoted, is believed to be eminently wise. With regard to the delicate and important functions pertaining to the conduct of foreign affairs, it is impossible to have a divided authority.

For the reasons mentioned, it seems clear that it was not the intent of Congress that the Government of the Philippines



502         CHAPTER IV.  TITLE, ETC. AND SOVEREIGNTY OF STATES

should, during the period in which the United States retains
sovereignty over the Philippines, deal directly with foreign
governments in matters relating to the extradition of criminals.

The Acting Attorney General (Keenan) to the Secretary of State
(Hull), Apr. 30, 1936, MS. Department of State, file 200.11B/13; Mr. Hull
to Attorney General Cummings, May 26, 1937, ibid. 200.11B/16, enclosing
a memorandum prepared in the Office of the Legal Adviser (200.11B/15).

With reference to the question of granting a visa to a member of the
household of President Quezon of the Philippine Commonwealth, the De-
partment of State on June 3, 1937 said:

"Philippine Government officials are considered to be foreign government
officials for visa purposes in view of [the] language of [the] Philippine
Independence Act."

Secretary Hull to Consul General Southard, June 3, 1937 (telegram),
MS. Department of State, file 811.111 Diplomatic/1023⅓.

## GUANO ISLANDS

### §77

The Department of State expressed the following opinion in 1907
regarding the legal status of guano islands appertaining to the United
States:

. . . the United States possess no sovereign or territorial
rights over guano islands. United States citizens who discover
guano, or their assigns are protected by this Government in the
prosecution of their enterprise which extends only to appropria-
tion and disposal of the guano thereon. This protection is ex-
tended under the Acts of Congress on the subject, compiled in
Title 72 of the Revised Statutes of the United States.

The Assistant Secretary of State (Bacon) to Messrs. Dudley and Mich-
ener, Jan. 3, 1907, MS. Department of State, file 3126.

To the same effect, see the Acting Secretary of State (Adee) to Mr.
Miles Carpenter, July 29, 1907, ibid. Minor File, vol. 12; the Third Assist-
ant Secretary of State (Phillips) to Mr. H. M. Walker, July 13, 1914,
ibid. file 811.0141/11; the Acting Secretary of State (Phillips) to Represen-
tative John Jacob Rogers, Apr. 28, 1922, ibid. 811.0141SW2/77; the Acting
Secretary of State (Castle) to Mr. R. F. Nichols, Sept. 1, 1922, ibid.
811.0141/54.

The act of August 18, 1856 (Sections 5570–78 R.S.; sections
1411–19, Title 48 U.S.C.) does not vest title to any of the Guano
Islands to which it applies in the discoverer but merely au-
thorizes the President, in his discretion, to protect the discoverer
or his assigns in the exclusive right of occupying such island,
rocks or keys for the purpose of obtaining guano and of selling
and delivering the same to the United States to be used therein.
In Duncan v. Navassa Phosphate Company (137 U.S. 647), the
Supreme Court of the United States said, "The whole right con-



**DEPARTMENT OF THE NAVY**
HUMAN RESOURCES OFFICE
(YOKOSUKA, JAPAN)
PSC 473, Box 22
FPO AP 96349-0022

12713
27 Dec 07

From:   Deputy Equal Employment Opportunity Officer, Human
        Resources Office Yokosuka

To:     Director, Equal Employment Opportunity Commission,
        Office of Federal Operations, P.O. Box 19848,
        Washington, DC 20036

Subj:   TRANSMISSION OF COMPLAINT FILE IN THE DISCRIMINATION
        COMPLAINT OF DIOSDADO GRUSPE V. DONALD C. WINTER,
        SECRETARY OF THE NAVY, DON #07-61581-02565, EEOC OFO
        DOCKET NO. 0120080796

Ref:    (1) Formal Complaint dtd 30 Aug 07
        (2) Notice of Dismissal of 6 Nov 07
        (3) EEOC OFO Letter of 12 Dec 07

Encl:   (1) Complaint File

1.  Reference (1) was received by this office on 13
September 2007 and was dismissed via reference (2) in
accordance with 29 CFR 1614.106.  Reference (3) was
received by this office on 21 December 2007.  Enclosure (1)
is forwarded for an Equal Employment Opportunity Commission
decision in the above case.

2.  For additional information regarding this case, please
contact Thomas LaBelle, Equal Employment Opportunity
Specialist, Human Resources Office - Yokosuka, by email at
Thomas.labelle@fe.navy.mil, by regular mail at PSC 473, Box
22, Code N134, FPO AP 96349-0022, or telephonically at 011-
81-46-816-9579.

JUNARION HUBBARD

Copy to: (w/o encl)
R. Nobles, LLC
D. Gruspe
HRO Yokosuka (Code N133)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P. O. Box 19848**
**Washington, D.C.  20036**

Dec 12, 2007

Rufus F Nobles                    Docket # : 0120080796
San Juan, San Narciso             Filed    : 11/23/07
Philippines,                      Agency Number(s): 076158102565


Dear Mr. Nobles:

This Commission acknowledges receipt of the above referenced appeal on the date indicated.  Any statement or brief in support of the appeal must be submitted to the Commission as well as to the agency within 30 days of filing the notice of appeal.  The Commission will accept statements or briefs in support of an appeal by facsimile transmittal (Fax number 202-663-7022) provided they are no more than ten (10) pages long.  You are reminded that it is your responsibility to ensure that the agency receives a copy of any material you submit to this office.  You should reference the above docket number in all submissions and correspondence to the Commission.

You will be notified by first class mail as soon as a decision is reached on the appeal.  You are responsible for providing the Commission with notice of any change of address.  The Commission will terminate the processing of the appeal if you file a civil action, in accordance with 29 CFR 1614.409.

The Commission's appellate regulations are found in Title 29, Code Of Federal Regulations, Part 1614 and at 64 Federal Register 37644 (1999).  The regulations are available on the Internet on EEOC's Home Page: WWW.EEOC.gov.  You are urged to review these regulations.

If you have questions regarding the processing of the appeal, please call the EEOC, Office of Federal Operations at (202) 663-4599 and ask to speak to the Attorney of the Week.

Sincerely,

Robert J. Barnhart, Director
Compliance and Control Division
Office of Federal Operations


CC:
Diosdado Gruspe
Libertad, San Narciso
Philippines

| 1. Name (Last, First, Middle) | | | | 2. SSN | | 3. Date of Birth |
|---|---|---|---|---|---|---|
| 1IZ622 044072 GRUSPE, DIOSDADO F. | | | | 0205-08-2153 | | 09-14-37 |

| 5. Veteran Preference | | | | 6. Serv. Comp. Date (Leave) | 7. Tenure | 8. Retirement |
|---|---|---|---|---|---|---|
| 1 | 1—None  3—10 Pt. Disab. 2—5 Pt  4—10 Pt. Comp | | 5—10 Pt./Other 6—10 Pt./Comp | 08-04-81 | 3 | 5 |

| 9. FEGLI | | 10. FLSA | | 11. Sex | 12. Citizenship | 13. (Corp Level Rpt) |
|---|---|---|---|---|---|---|
| A   Ineligible | | E | E-Exempt N-Nonexempt | M | 8 | |

| 14. Effective Date | 15. Annuitant Indicator | | 16. Work Schedule | | 17. (Reserved for OPM Use) |
|---|---|---|---|---|---|
| 04-24-83 | 9 | 1-Reempl Ann-CS 3-RETM  8-RETM & CS 2-RETO  4-RETO&CS  9-Not Applicable | F | F—Full-time P—Part-time I—Intermittent  G—FY Seasonal O—PT Seasonal J—INT Seasonal | |

| 18-A. NOAC | 18-B. Nature of Action | 19-A. NOAC | 19-B. Nature of Action |
|---|---|---|---|
| 713 | Change to Lower Grade | | |

| 18-C. Auth Code | 18-D. Authority | 19-C. Auth Code | 19-D. Authority |
|---|---|---|---|
| BPM | C.S. Rule 8.3 | | |

| 18-E. Auth Code | 18-F. Authority | 19-E. Auth Code | 19-F. Authority |
|---|---|---|---|
| | | | |

| 20. FROM: Position Title and Number | 27. TO: Position Title and Number |
|---|---|
| Cable Splicer Foreman I JD# PWC-1303 | Cable Splicer JD# PWC-508 |

| 21. Name and Location of Employing Office | 28. Name and Location of Employing Office |
|---|---|
| | NAVFACENGCOM U.S. NAVY PUBLIC WORKS CENTER Utilities Department, Electrical Division Distribution (Opns/Maint) Branch Electrical Systems Maint Section, WC-622 |

| 22. Pay Plan & Occupational Code | 23. Grade or Level | 24. Step or Rate | 25. Salary | 26. Pay Basis | 29. Pay Plan & Occupational Code | 30. Grade or Level | 31. Step or Rate | 32. Salary | 33. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| PWF-12 | 08 | 01 | ₱13.42 | | PW-12 | 15 | 02 | ₱8.67 | PH |

| 34. Duty Station | 35. Position Occupied | 36. Appropriation Code (Optional) |
|---|---|---|
| Subic Bay, Philippines | 2 | 1-Competitive  3-SES General 2-Excepted  4-SES Career Reserved | NIF |

37. Remarks

From temporary promotion.

13.01

UIC 62808

| 38. Approval | | 39. FPMIS Data | | | |
|---|---|---|---|---|---|
| A. Title of Approving Official | B. Date | A. Sep or Intagr Ind | B. VEV IND | C. PRD | D. Serg  Unit Status  F. Teacher's Cert |
| Head, FN Personnel Branch | 04-21-83 | C | N | 0 | 8883 |
| C. Signature/Authentication of Approving Official | | F. Ed. Level | G. Yar Degm Attind | H. Actual Location | Agency Code |
| | | 13 | | | RV25 |
| G. L. CARTER | | I. Location Code | | | J. SSN |
| | | RP-5000-000 | | | 2131 |
| 40. Employing Department or Agency | | M. RNO | N | | |
| Department of the Navy | | | | | |



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Diosdado Gruspe,
Complainant,

v.

Dr. Donald C. Winter,
Secretary,
Department of the Navy,
Agency.

Appeal No. 0120080796

Agency No. 076158102565

<u>DECISION</u>

Complainant filed a timely appeal with this Commission from the final agency decision dated November 6, 2007, dismissing his formal complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*

On July 10, 2007, complainant initiated EEO Counselor contact. Informal efforts to resolve his concerns were unsuccessful.

On September 13, 2007, complainant filed the instant formal complaint. Therein, complainant claimed that he was the victim of unlawful employment discrimination in reprisal for prior protected activity when he discovered that agency management failed to inform him of his right to make payment into the Civil Service Retirement and Annuity Funds or the Philippines Retirement System. Complainant claimed that as a consequence, he was not entitled to retirement benefits under the applicable program when he retired in 1992. Complainant claimed that he did not have knowledge of the EEO law and process until approximately July 2007.

In his formal complaint, complainant cites January 8, 1988 as the date of the alleged discriminatory incident. The documentation of record, moreover, clearly reflects that complainant retired from agency employment in 1992. The Commission has consistently held that a complainant must act with due diligence in the pursuit of his claim or the doctrine of laches may apply. See *Becker v. United States Postal Serv.*, EEOC Appeal No. 01A45028

(November 18, 2004) (finding that the doctrine of laches applied when complainant waited over two years from the date of the alleged discriminatory events before contacting an EEO Counselor); *O'Dell v. Department of Health and Human Serv.*, EEOC Request No. 05901130 (December 27, 1990). The doctrine of laches is an equitable remedy under which an individual's failure to diligently pursue his course of action could bar his claim. Complainant waited approximately nineteen (19) years from the date of the alleged discriminatory event, on or around January 8, 1988, before he contacted an EEO Counselor in July 2007. Complainant has failed to provide sufficient justification for extending or tolling the time limit. Accordingly, the agency's final decision dismissing complainant's complaint on the grounds of untimely EEO Counselor contact is **AFFIRMED**.

Because we are affirming the agency's dismissal based on the grounds of untimely EEO Counselor contact, we do not find it necessary to address the agency's dismissal of the instant complaint on alternative grounds.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

    1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

    2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The

3                                                     0120080796

Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

FEB 2 7 2008

Date

4                                0120080796

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed**. I certify that this decision was mailed to the following recipients on the date below:

Diosdado Gruspe
Libertad, San Narciso
2205 Zambales
Philippines 601

Rufus F. Nobles
Libertad, San Narciso
2205 Zambales
Philippines 601

William A. Navas Jr., Asst. Secretary, MRA/EEO
(NAVOECMA) OCHR Code 015
Department of the Navy
614 Sicard St., SE #100
Washington Navy Yard, DC  20374-5072

FEB 2 7 2008
_____
Date

_____
Equal Opportunity Assistant

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

### I (a) PLAINTIFFS

*DIOSDADO GRUSPE*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  **99999**
(EXCEPT IN U.S. PLAINTIFF CASES)

*PRO SE* (PH)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

### DEFENDANTS

*DONALD C. WINTER, SECRETARY*
*OF THE NAVY*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:08-cv-01040
Assigned To : Robertson, James
Assign. Date : 6/18/2008
Description: Employ. Discrim.

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other)** OR ☐ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255* | ☐ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**ⓧ ORIGIN**

| ⊗ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ Multi district Litigation | ☐ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

---

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23      **DEMAND $**   Check YES only if demanded in complaint
**JURY DEMAND** ⊗ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES   ⊗ NO   If yes, please complete related case form.

**DATE**   **SIGNATURE OF ATTORNEY OF RECORD** *NCD*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.